LOTTINGER, Judge.
This is a tort action which was tried before a jury which found for the plaintiff in the amount of $8,000.00. The defendant insurer has appealed and the plaintiff has answered the appeal asking that the award be increased to the full policy limits of $10,000.00. Liability is no longer an issue in the case and hence the appeal presents solely the question of quantum.
The plaintiff was injured in an automobile accident which occurred on December 30, 1959, north of Denham Springs, Louisiana. She was treated at the Baton Rouge General Hospital and returned home the same day. She returned to her employment as a sales clerk with the B. Stern Company in Amite, Louisiana, on February 22, 1960, and worked until May 14, 1960. She was married on June 5, 1960, and a child was born to her on April 9, 1961. She testified that she was expecting a second child in June of 1962.
The plaintiff was seen by four doctors. The first to treat her was Dr. James E. Williams, Jr., general practitioner, the pertinent part of whose testimony is as follows:
“She complained of the wounds about the right eyebrow and the left knee which wounds were quite obvious at the time of her arrival. She had sustained lacerations in the area of the right eyebrow and the left knee. Examination revealed no gross evidence of fractures or dislocations. The right eyebrow was cut and bleeding fairly profusely. This laceration was approximately lj4 inches in length. There was also about approximately a 3 inch laceration over the left knee.
******
“In conclusion I might state that the patient as a result of this accident has sustained laceration to the right eyebrow and left knee as described, multiple contusions in the area of the neck, the lower lumbar area and the left knee and also to some lesser extent the lower anterior rib cage. I felt at the time I wrote this report which was on February 23rd in view of what I had seen from December 30th through January 13th, that she was suffering no permanent disability or disfigurement. I felt that she would be partially disabled about six weeks from the time of the injury.
******
“Q. Now, at the time of your examination you did not anticipate that the laceration on the right eyebrow and over the left knee would produce any scarring tissue ?
“A. I did not think that they would produce excessive scars.
“Q. Now, Doctor, I would like for you to examine the scar on the right eye of Rosalie and describe them for the record.
“A. This is a linear, that is an almost straight line lacertation over the right eyebrow, which we had measured approximately at about li/£ inches and which scar now measures approximately 1 inch which is not unusual in this tract.
“Q. Would it be considered a serious cosmetic defect?
“A. No sir. I don’t think so.
*447 ******
“By the Counsel: Let the record show that Dr. Williams examined the plaintiff’s knee.
“A. It shows in here a laceration over the left knee over the left patella, outer aspect of the left patella which has healed well.
“Q. Is it not a fact doctor that the position of the scar over the flexed part of the knee reduces any possibility of it being serious cosmetic wise?
******
“The Witness: Let me word my answer a little bit different from the direct answer, is that all right?
“Mr. Tucker: That will be all right.
“A. I believe that I can say that the redundancy of the skin over the knee, or over an elbow for instance, those being two carthic joints on which pressure frequently bears, that perhaps this would not be too evident.”
When questioned with respect to a fall which plaintiff sustained shortly after her marriage in June of 1960, Dr. Williams testified as follows:
“Q. Now, it has been testified that Rosalie fell down a flight of steps some short period after she was married in June of 1960 which was some six to eight months later, at which time, there was apparently another injury to the knee. In your experience as a medical practitioner is it not possible that the condition that you found on your examination of the knee after the automobile accident might have subsided completely, and that the fall down the stairs, way some eight months later, would have caused the injury from which she is required to wear the brace ?
“A. I would have to say that is entirely possible, yes.”
The plaintiff was referred by Dr. Williams to Dr. William E. Smith, orthopedic specialist of Baton Rouge. This doctor saw her on approximately ten occasions and testified as follows:
“A. Following my examination of Rosalie Lamonica it was my impression that she had suffered contusions and abrasions about the face, and both knees, and in addition she had suffered a contusion' of her left hand. I felt that she had a minor lumbar scoliosis and cervical sprain as a result of this accident. I stated in my report to Dr. Williams on January 21, 1960, that I felt that this patient’s subjective complaints were somewhat out of line with her relative minimal objective clinical findings.
* * sje * * *
“Q. Now after the accident where were the brusies, and the complaint caused from the accident?
“A. In my initial examination on January 13, 1960, she was found to have contusions, abrasions in acomonic areas over both knees and she had a healing laceration of the left knee. This would be over the front portion of the knee.
“Q. As to the actual knees themselves where the fall caused one that was slightly above the knee ?
“A. Yes, when I saw her in August 1960 she had one on the inside, yes.
“Q. As I understand from the evidence that has already been produced of the lay witnesses you prescribed a knee brace for her after the fall in August of 1960?
“A. That is correct.
“Q. Is this the type of knee brace you prescribed, Doctor? I have one right here?
“A. That is the type I prescribed.
*448 ífc # ‡ Sjí jfí ♦
“A. * * * She returned to my office on January 27th, 1960, at which time she thought she was doing better. She had been fitted with her back brace, and I examined to see that it fit satisfactorily at that time. I thought my physical examination of the lower portion of her back was largely within normal limits at that time. She was advised to continue with her support and to return to see me within three weeks. This patient returned to my office as requested on February 17, 1960, at which time she reported to me that she was doing even better. She said that she was having occasional discomfort in the lower portion of her back and her left knee. As to questioning at this time she said that the left knee was giving her a little trouble, but nothing too bad. She stated that she had some sensitivity over this left knee and she complained of tenderness when I examined the scarred areas of her left knee. She was found to have inch of wasting away or atrophy of this left thigh at this time, which would indicate to me that she had had enough discomfort in this knee to avoid using her left knee normally which would cause the muscles to lose some of their tone and some of their strength. She was advised at that time to take some exercises for her knee which were demonstrated to her.
“She was to continue with her back brace as she felt she needed it, but I advised her to begin going for increasingly longer periods each day without it so that she would not get too dependent upon it.
“A this time Rosalie asked me about going back to work, and I felt that she could return to work on February 22, 1960, which was the following Monday. I asked her to return to see me in four weeks. Rosalie returned to my office on March 16, 1960, and she stated that she was doing well as far as her back was concerned but she again told me that she was having trouble with this left knee. She was again found to have some tenderness to examination over the upper and inside portion of her lower leg. I felt a little uneasy about this situation so to make sure everything was all right I made some more x-rays of this knee and upper leg area. This failed to reveal any difficulty with the bony structures of this area. She had a tenderness over a specific area of this knee where three tendons from the upper part of her leg come in to insert, and this is an area in Greek or Latin, I have forgotten which — which is termed the pes an-serine area. Pes anserine is a Latin word — a goose’s foot actually looks— where the tendons come in almost looks like what you would expect to see from looking at the under side of a goose’s foot' — kind of triangular shaped and has three or four prongs to it. I considered at this time the possibility of bursitis of this area. Sometimes certain individuals develop bursitis in this pes anserine area and require treatment. I examined this individual’s knee again at that time and it was found at this time that she had regained her strength and volume of the muscle of her thigh. She no longer had this atrophy which had been noted in the previous examination.
“Mr. Tucker: Was this March 15h Doctor, excuse me?
“A. Yes Sir. I asked her to return to see me in about six weeks from that time. She had an appointment with my Secretary on April 27, 1960, but failed to keep that appointment. She returned to my office on May 25, 1960, and she told me that her back and all the other area where she had had previous difficulty were completely well, but that she was still having trouble with the left knee.
*449 * * * * * *
■“She returned to my office next on February 10, 1961, and she stated at that time that she continued to have pain in the left knee, complained of swelling in the left knee, and continued to complain of the giving away sensation in her left knee. She stated that she had continued to have difficulty off and on with this knee since last being seen by me, and she told me that she had been seen by a Dr. LeNoir in New Orleans, that by reference of the insurance company, and she stated that he suggested “radium treatments” for the left knee.
“This patient was about six and a half or seven months pregnant according to her estimate at that time, and she stated that she was afraid that her left knee was going to give away beneath her and that she would fall and injure either herself or her baby. I carried out a complete physical examination of the left knee at that time which I felt was within normal limits, except for the previous noted area of healed scarring over the anterior portion of this knee, or the front portion of the knee. The Clinical measurements of the thighs, of the knees and the calves were all equal at that time. There was no evidence of any swelling of the joint at the physical examination at that time, there was no evidence to me of thickening of the joint lining which can be detected by clinical examination, and there are two or three tests which we carry out in orthopedics to attempt to determine whether or not there is torn cartilage in the knee. I am sure all of you have heard of football knees, or torn cartilages inside the knee and have known of a number of people who have had operations for this. These tests have men’s names attached to them, which could not mean too much here, but all of these tests were negative. In other words, they showed no evidence of cartilage being torn within the knee joint.
“I felt that this patient had no definite signs of internal derangement or tearing inside the joint but in order to decrease the possibility of this individual falling and injuring herself or her baby I felt that this knee cage would be in order to help support this knee in spite of the fact that I could find nothing wrong with it. This was a very simple procedure, and an inexpensive procedure that we could do here that would cause no particular harm and may do some good. In other words, I was unable to find anything wrong with this knee, but the possibility of making a mistake is always there, sometimes the signs cannot be present when the pathology is actually there, and to make doubly sure I felt that this would do no harm to fit her with the knee cage, or the knee brace, which was done at that time.”
When asked if the type of bursitis referred to by him was associated with trauma, Dr. Smith testified that it was not.
Dr. James L. LeNoir, an orthopedic specialist of New Orleans, saw plaintiff on March 11, 1960, and September 7, i960. He testified as follows:
“Q. Now Doctor what was your opinion in this case.
“A. Well, my opinion was that the patient had evidently sustained a bruise of the knee, and also had sustained a cut of her head, which of course was gone by the time I first saw her. Even though she had complaints referable to her knee and her back, I was unable for lack of evidence, medical evidence, to make a definite diagnosis of injury or residuals of injury to either of these areas at the time seen by me which was several months after the accident. It was felt by me that a strain of the back actually where no fracture, dislocation or anything had occurred, that the strain of the back *450 could account for her complaints referable to the hack, although the evidence which would allow me to make that as a diagnosis at the time I saw her was not present.”
Dr. Blaise Salatich, orthopedic specialist of New Orleans, summarized his testimony ns follows:
“Q. Why do you have a different opinion — have you performed the usual objective tests? Just as set out in the reports of the other doctors?
“A. Yes. For the benefit of the Court and to save time — I can tell you why I am convincedly opinionated that she had a torn cartilage, or a derangement of the knee. According to the best known, let’s say, outstanding orthopedic experts on knee injuries and pathology . — she was thrown suddenly forward landing on the floor board, or on the floor, that is a mode of trauma that may be rather good to set up a knee injury. Two, she sustained not one cut, but two cuts over the knee showing that she came in contact with a fair amount of crushing force, and there was nothing sharp that she knew of that she struck. Three, immediately, or let’s say, rapid swelling, severe pain and discoloration of the knee; Four, inability to bear weight on it; Five, she was fitted with a hinge type knee brace by her attending doctor. She wore the knee brace from four to five months after the accident which meant that her knee was giving her enough trouble four and five months after this accident for a doctor who had followed her all along to order a hinge and that is rather rigid — a knee cage normally does not have the hinges — a hinge is for when you really have wishy-washy unstable knee. She wore that hinge brace for four to five months which brought it up to eight months after the accident. I saw her after she had fallen several times and was able to demonstrate, and I would like to demonstrate to the Court to-day the wasting in her thigh muscles as she has now a 1J4 inch difference in her left thigh and her right thigh. That fulfilled a criteria together with the painful clicking test and the difficulty in stopping and squatting together with this other history I have given is rather indicative and it doesn’t make anything less serious. Let’s say this, May I add again why I would be surer, I have personally had a torn knee semi-lunar cartilage * *
We believe that a preponderance of the testimony shows that the injuries received by plaintiff were not such as to entitle her to the award granted her and, indeed, that same is considerably excessive. All things considered we believe that the sum of $2,500.00 would furnish adequate compensation for plaintiff’s pain and suffering and the minor scars that she bears, plus $260.00 for loss of wages.
For the reasons assigned, the judgment appealed from is reduced from the sum of $8,000.00 to the sum of $2,760.00.
Judgment amended and affirmed.